**SO ORDERED.**

**SIGNED this 6th day of February, 2018.**

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RainTree Healthcare of | ) | Case No. 17-51237 |
| Forsyth LLC, | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS

This case came before the Court for hearing on January 23, 2018, on the Motion to Dismiss Case or in the Alternative to Convert Case to Chapter 7 ("Motion to Dismiss or Convert") [Doc. 30] filed by the Assistant Bankruptcy Administrator ("BA") on December 22, 2017. On January 22, 2018, RainTree Healthcare of Forsyth LLC ("Debtor" or "Raintree") filed a reply ("Reply") [Doc. 36]. At the hearing on the Motion, Robert E. Price, Jr. appeared as counsel for the BA and Robert Lewis, Jr. appeared as counsel for the Debtor. At the hearing, the Court took judicial notice of the related court proceedings in the Bankruptcy and District Courts for the Western District of North Carolina in

1

which the Debtor is a party.[1]  For the reasons set forth below, the BA's Motion will be granted.

## I.    Jurisdiction and Authority

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.   Under 11 U.S.C. § 157(a), the United States District Court for the Middle District of North Carolina has referred this case and this proceeding to this Court by its Local Rule 83.11.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), in which this Court has statutory authority to enter final judgments.   The Court has constitutional authority to enter final judgment in this proceeding.

## II.  Background

Day in and day out, this Court is faced with many difficult decisions in determining the financial fate of livelihoods, personal finances, and the futures of businesses and consumers, most of whom come to this Court with good intentions seeking the broad and powerful relief granted to them through this Court

---

[1] See In re AA Holdings-Winston-Salem, LLC, Ch. 11 Case No. 17-31083 (Bankr. W.D.N.C. June 29, 2017) ("AA Holdings Bankruptcy Case"); RainTree Healthcare of Forsyth, LLC v. AA Holdings-Winston-Salem, LLC, Case No. 3:17-cv-654-MOC (the "AA Holdings Appeal").   The Court may take judicial notice of the records in the related litigation in the Western District of North Carolina. Owens v. Smith, No. 94-7363, 52 F.3d 321 (Table), 1995 WL 236666, *2 (4th Cir. Apr. 24, 1995).   Since many of the same facts are crucial in this case as in the AA Holdings proceedings in the Western District of North Carolina, it is proper for the Court to take judicial notice of those records.   See U.S. Fidelity & Guaranty Co. v. Lawrenson, 334 F.2d 464, 467 (4th Cir. 1964) (judicial notice is permitted of records in related case, especially where many of the same facts are crucial in the related cases).

under the United States Bankruptcy Code.  This is not one of those cases.  In this case, Debtor never has had any operations,[2] has no employees, and has no prospect for future operations. Instead, Debtor contends that it has a singular asset that it hopes to sell, a license to operate an adult care facility. Nevertheless, the record before the Court demonstrates that Debtor does not even have that, and, even if it did, Debtor has failed to articulate any proper purpose for a chapter 11 case or the imposition of the automatic stay, and none exists.[3]

On June 3, 2015, one of Debtor's principals, Reema Owens ("Owens"), acting on behalf of Debtor, executed a five-year lease (the "Lease") with AA Holdings-Winston-Salem, LLC ("AA Holdings") for property located at 2900 Reynolds Park Road in Winston-Salem, NC (the "Property").  Order Rejecting Lease,[4] pp. 2-3.[5]  An adult care home formerly known as "Cornerstone Living

---

[2] "Raintree is not now and has never taken actual possession of the Facility. The Facility has been vacant and un-occupied since in or about April 2015." Motion to Dismiss or Convert, Ex. A, p. 8 ¶ 23 ("Order Rejecting Lease"); see also id. ¶ 25.c.

[3] This is not the Court's first experience with Owens and counsel filing a chapter 11 case for an improper purpose.  See In re Rain Tree Healthcare of Winston Salem, LLC, Case No. 17-50375 (Bankr. M.D.N.C. July 5, 2017) (the "Rain Tree Healthcare Case") [Doc. 109] (the "Rain Tree Healthcare Order Denying Stay Pending Appeal").  In that case, Owens similarly testified that she wished to sell the Facility as a means to finance the Rain Tree affiliate, but failed to carry her burden establishing any ability to do so. Id. at 20.

[4] The Order Rejecting Lease is Doc. 58 in the AA Holdings Bankruptcy Case.

[5] Owens testified that she owns ninety percent of the equity interests in the Debtor and that her mother, Betty Davis, owns ten percent.  This testimony is inconsistent with the findings of the United States Bankruptcy Court for the Western District of North Carolina.  See Order Rejecting Lease, pp. 6-7 ¶ 20.

Center" was located at the Property (the Property and the improvements thereon connected with the adult care home shall be referred to herein as the "Facility"). Id.

A year and a half later, on November 15, 2016, Owens, again purportedly acting on behalf of the Debtor, entered into an Agreement with Winston-Salem AL Investors, LLC ("AL Investors"). Ex. 1.[6]  The Agreement contemplated that AL Investors would apply to Division of Health Service Regulation, Adult Care Licensure Section ("DHHS") for a Certificate of Need to construct a replacement facility (the "Replacement Facility") for the 121 "Authorized Beds" located at the Property and would make several payments to Debtor totaling $1,028,500 (defined in the agreement as the "Forbearance Payment") in exchange for covenants and forbearance of rights by Debtor, the (unidentified) "Lender" that holds a deed of trust on the Property, and the property owner, AA Holdings.  Among the covenants required from the Debtor as a condition of any payment, Debtor was required: (1) to "state[], affirm[], and warrant[] that [AA Holdings] and Lender have no rights, claims or lien against the Authorized Beds [licensed to be operated at the Facility] . . . and that they are not entitled to receive any proceeds from the transactions contemplated herein," Ex. 1, ¶ 1.e.; (2) to "pay all fees and costs associated with the current license, the Real

---

[6] No one from AL Investors appeared at the hearing on this matter.

Estate and the Facility as necessary to keep the Facility and License in good standing until the Replacement Application is filed," id. ¶ 3.c.; (3) "to take any action necessary to renew the License and keep the License in good standing[,]" id.; (4) to "help coordinate the delivery to [AL Investors] an executed agreement from [AA Holdings] and Lender . . . which agreement shall contain . . . the acknowledgment that [AA Holdings] and Lender consent to the transaction contemplated herein and waive any right, claim or lien they have to the Authorized Beds and/or COPN Rights,"[7] and "to forbear and take no action to exercise any of their rights against the [Property] or Facility as long as this Agreement is in effect." Id. ¶ 5. Closing of the agreement was specifically made contingent upon the following preconditions, among others: (1) delivery by AA Holdings and the Lender documentation and instruments "to demonstrate that the Lender and [AA Holdings] expressly and completely acknowledge and confirm that (i) they don't have any lien, rights or claims to any certificate of need rights associated with the Facility or Property, (ii) they don't have any lien, rights or claims to the Authorized Beds . . . , and (iii) that [sic] they don't have any rights or claims that could be exercised to prevent issuance of the Replacement CON and/or the construction and development

---

[7] The Agreement lists "COPN Rights," but COPN is never defined. Elsewhere, "CON" is defined as Certificate of Need and is presumed to be what the parties meant for purposes of this Memorandum Opinion.

of the Replacement Facility[,]" id. ¶ 6.b.; and (2) "[t]he representations and warranties of [Debtor] contained in this Agreement . . . shall be true and correct as of the Closing Date . . . ." Id. ¶ 6.c.

On February 24, 2017, the North Carolina Department of Health and Human Services, DHHS denied the Debtor's license renewal application to operate the Facility.  Ex. 3, pp. 2-3. The renewal was denied because of the Debtor's continued breach of a September 25, 2015, Settlement Agreement between the Debtor and DHHS.  Id.[8]  The denial was due to Debtor's failures: (1) to apply for a Certificate of Need ("CON") to relocate beds; (2) to undertake and complete improvements to the Facility necessary to bring the Facility into compliance with applicable construction requirements and to request an inspection of the Construction Section of the Division of Health Service Regulation; and/or (3) to request a reasonable extension under the terms of the agreement.  Id.

Despite DHHS denying the renewal of Debtor's license to operate the Facility, Owens entered into an amendment to the agreement with AL Investors on April 14, 2017.  Ex. 2 (the "AL Amendment").  The AL Amendment did not acknowledge that the

---

[8] A copy of the Settlement Agreement is attached as Exhibit A to Doc. 8 in the AA Holdings Bankruptcy Case.  It is unclear from the record, including the Settlement Agreement, whether Debtor was or became the "License Holder" as contemplated by the Settlement Agreement, but the Court has assumed that it became so for purposes of this opinion.

renewal of the license was denied, nor did it purport to account for the denial in any way.  Instead, the amendment recited that AL Investors had become aware that the Lender and AA Holdings "may have entered into a contract to sell the [Property] and Facility to a third-party and [AL Investors] anticipates a dispute over its pursuit of the Replacement CON . . . ."  Id. at 1.  The amendment provided that AL Investors would receive a 2 to 1 credit (capped at $300,000) to the Forbearance Payment amount for any "actual out-of-pocket expenses, fees and costs it incurs in preparing the Replacement Application and pursuing the Replacement CON . . . until such time that all parties that may have an interest in the [Property], Facility and/or Authorized Beds (including but not limited to Lender, [AA Holdings], [AL Investors], third-party prospective purchasers, etc.) reach a settlement agreement . . . ."  Id. at 1-2.  The amendment did not purport to alter or amend the conditions to closing in the original agreement, including the requirements that AA Holdings and the Lender stipulate and agree that neither claimed any interest in the 121 Authorized beds and/or associated CON Rights.

A few months later, AA Holdings commenced the AA Holdings Bankruptcy Case by filing a voluntary petition under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina on

7

June 29, 2017 (the "Western District Bankruptcy Court").  Within a week of filing its petition, AA Holdings filed a: (1) Motion Pursuant to 11 U.S.C. § 365 to Reject Purported Lease with Raintree Healthcare Forsyth, LLC and to Declare Such Lease Terminated [AA Holdings Bankruptcy Case, Doc. 8] (the "Motion to Reject"); and (2) Motion for Authority to Sell Property Free and Clear of All Liens, Claims, Interests, or Encumbrances Pursuant to sections 105 and 363 of the Bankruptcy Code [AA Holdings Bankruptcy Case, Doc. 11] (the "AA Sale Motion"), seeking to sell the Property, Facility, and CON Rights associated therewith, including the license, to Mainstay Financial Services, LLC ("Mainstay").  AL Investors objected to the AA Sale Motion, arguing that the CON Rights were not property of the AA Holdings bankruptcy estate, but instead were held by Debtor because they had been sold to Debtor under a prepetition agreement with AA Holdings.  [AA Holdings Bankruptcy Case, Doc. 25] (the "AL Sale Objection").  In its objection, AL Investors further contended that Debtor had agreed to sell "the Facility's CON Rights" to AL Investors.  Id. at 2.  Both AL Investors and Debtor objected to the AA Motion to Reject.  See AA Holdings Bankruptcy Case, Docs. 29 and 30, respectively.  AL Investors objected to the extent that any rejection purported to affect the sale of the CON Rights to Debtor that AL Investors contended

occurred under the "September Lease," as discussed below.   <u>See</u> AA Holdings Bankruptcy Case Doc. 29, pp. 1-2.

In Debtor's objection to the AA Holdings Motion to Reject, Debtor contended, <u>inter alia</u>, that: (1) through a second lease purportedly entered between Debtor and AA Holdings on September 30, 2015 (the "September Lease"), it obtained sixty percent of the ownership in the Certificate of Need used for operating the facility, <u>see</u> AA Holdings Bankruptcy Case Doc. 30, p. 1 ¶¶ 3-4; (2) Debtor was current under the September Lease with AA Holdings; (3) the denial letter from DHHS was invalid because of a pending appeal filed by the Debtor attached to the objection as Exhibit 2,[9] <u>id.</u> ¶ 6; (4) "[t]he value of the property owned by [AA Holdings] is increased by Raintree maintaining licensing with the facility," <u>id.</u> at 2 ¶ 7; (5) the Certificate of Need was not property of the AA Holdings bankruptcy estate, <u>id.</u> ¶ 11; and (6) "[d]ue to the uniqueness of Raintree's license to provide potential resident contracts, terminating the lease would not be in the best interests of [AA Holdings], Creditors or the Bankruptcy Estate and would benefit no one." <u>Id.</u> ¶ 14.

After an extensive evidentiary hearing on the Motion to Reject, the Western District Bankruptcy Court entered its order on October 15, 2017 ("Order Rejecting Lease"), declaring the Lease terminated and determining that the September Lease was

---

[9] The same document was presented by Debtor as Exhibit 3 in this case.

fraudulent and the CON Rights were property of the AA Holdings bankruptcy estate. In its ruling, the court found that Raintree was in breach of the terms of the Lease. <u>See</u> Order Rejecting Lease, p. 4 ¶¶ 7-9. The court further and specifically made the following findings of fact:

11. On February 24, 2017, the Division of Health Service Regulation ("DHSR") sent correspondence to Betty Davis, the managing member of Raintree, denying Raintree's License renewal for 2017 (the "Renewal Denial"). The Renewal Denial states that DHSR denied Raintree's "request for a 2017 license based upon the [F]acility's history of noncompliance and endangerment of health, safety and welfare of residents resulting in revocation of the [F]acility's license on April 19, 2016 and outstanding fees, fines, and penalties imposed by the State against the [F]acility." . . . .

12. Due to the Renewal Denial [by DHHS], on February 28, 2017, pursuant to Section 16 of the Lease, [AA Holdings] terminated the Lease by sending correspondence to counsel for Raintree . . . .

* * *

16. . . . [I]f the Court found the September Lease to be valid, which it does not, Raintree is in default of the September Lease.

* * *

20. The September Lease was executed on behalf of Raintree by Reema Owens . . . , claiming to be the managing member of Raintree. However, approximately two months prior to the execution of the September Lease, via that certain *Stock Purchase Agreement* dated July 14, 2015 (the "Stock Purchase Agreement"), Owens had transferred her membership interest in Raintree to Betty Davis. At the time that the September Lease was executed, Betty Davis, not Reema Owens, was the managing member of Raintree. Consequently, Reema Owens did not have the authority to execute the September Lease. . . .

* * *

22. Raintree presented no evidence at the Hearing . . . rebutting the Debtor's contention or evidence that the September Lease was fraudulent.[10]

Order Rejecting Lease, pp. 5-8. The court thereafter further concluded:[11]

32. The Court further finds based upon the overwhelming evidence and the testimony . . . that [AA Holdings] has not transferred its rights and authority to operate one hundred twenty-one (121) adult care beds associated with the Facility (the "CON Rights") to Raintree or anyone else and that [AA Holdings] holds all right, title and interest in the CON Rights pursuant to 11 U.S.C. § 541. The September Lease in paragraph 3 provides:

> LICENSE. Lessee shall have a license to use the Facilities during the term of this Agreement in accordance with the terms and conditions of this Agreement, and shall have rights to the License and Certificate of Need ("CON") according to the settlement agreement signed agreed and approved by the Division of Health Service Regulation on September 25th, 2015 in and to the Facilities. . . . The License and CON shall be transferred and/or sold with proceeds divided by Raintree and [AA Holdings] for an amount not less than 60% of the proceeds to Raintree and 40% to [AA Holdings].

33. The Court specifically finds that paragraph 3 of the September Lease did not effectuate a transfer of the CON Rights to Raintree, but if valid, was rather an executory agreement regarding the division of the sale proceeds of the CON Rights upon such sale.

* * *

---

[10] The court identified numerous factual bases upon which it determined that the September Lease was fraudulent. Order Rejecting Lease, p. 7 ¶ 21.

[11] These conclusions are within the portion of the Order Rejecting Lease denoted as Conclusions of Law. Nevertheless, these findings contain mixed determinations of fact and law.

37. Here, Raintree has defaulted in the performance of its obligations under the Lease in many respects . . . . Furthermore, Raintree has had due notice of all of these defaults.

38. Given the multiple material defaults of Raintree, the fact that the Lease had been terminated by [AA Holdings] and the fact that Raintree has never taken physical possession of the Property or the Facility, the Court finds that the Lease should be terminated and all of Raintree's rights to the Property should be terminated, including, but not limited to, Raintree's right to possession of the Property and Raintree's license to use the Facilities granted in paragraph 3 of the Lease.

Id. at 11-14 ¶ 32-38.

Debtor moved for the court to reconsider its decision on October 23, 2017. After a protracted series of exchanges in which Debtor repeatedly failed to comply with established timelines, on November 6, 2017, the Western District Bankruptcy Court denied Debtor's motion to reconsider, finding specifically that "Raintree abused the purpose of Rules 59 and 60 of the Federal Rules of Civil Procedure, as well as Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, to cause further delay in this chapter 11 case." Motion to Dismiss or Convert, Ex. C, ¶ 35.

Debtor filed a notice of appeal from the Order Rejecting Lease with the United States District Court for the Western District of North Carolina (the "District Court"). AA Holdings Appeal [Doc. 1]. Debtor filed an initial request for an extension of time in which to prepare the record for appeal,

12

which the District Court granted.   In response to Debtor's
second motion for an extension of time, the District Court
entered its order stating as follows:

> One of the main reasons plaintiff requested this
> extension was because plaintiff has not received a
> completed transcript of the hearing that led to the
> Order currently being appealed. However, in
> defendant's response, defendant notes that plaintiff
> has not filed an order for a transcript with the
> bankruptcy clerk. As a result, plaintiff's proffered
> reason for an extension appears to be disingenuous.
> Plaintiff's motion will thus be denied, and plaintiff
> shall provide a statement of issues on appeal within
> three business days of entry of this order or the
> appeal will be dismissed.

Id. No. 7.

Despite its prior objections to the AA Holdings Sale Motion
and Motion to Reject, AL Investors participated and was the
successful bidder in an auction of the assets of AA Holdings
(including the CON Rights to the 121 "Authorized Beds") in the
Western District Bankruptcy Court for a purchase price of
$2,300,000.00.  See Order Pursuant to 11 U.S.C. § 105 and § 363
Authorizing the Debtor to Sell Property Free and Clear of all
Liens, Claims, Interest or Encumbrances [AA Holdings Bankruptcy
Case, Doc. 79] (the "AA Holdings Sale Order"), pp. 6-8 ¶¶ 19-22.
AL Investor's obligation to close was conditioned upon its
having

> received issuance of a Certificate of Need ("CON")
> from the North Carolina Division of Health Service
> Regulation (the "CON Issuance"), through settlement or
> otherwise, approving Purchaser's application to

transfer all CON Rights associated with the 121-bed adult care facility to Purchaser and authorizing Purchaser to develop a 121-bed replacement facility as set forth in such CON application. Said approval may be in full or conditional upon the Purchaser's Closing Deliveries.

Id. Ex. A, Section 7.1.8.

On November 9, 2017, the Western District Bankruptcy Court entered the AA Holdings Sale Order approving the sale of all AA Holdings' assets, including the CON Rights to AL Investors.  The Sale Order provides that AL Investors is a good faith purchaser under 11 U.S.C. § 363(m), and provides that its purchase of the Assets is broadly free and clear of other claims and interests.  Id. at 11, 12-13 ¶¶ 34, G, I.[12]  AA Holdings consummated the sale with AL Investors' designee on December 28, 2017.  [AA Holdings Bankruptcy Case, Doc. 106] (the "Report of Sale").  Debtor

---

[12] Section 2.4. of the Asset Purchase Agreement approved by the Western District Bankruptcy Court (the "APA") defined the "Assets" to include the "CON Rights," which, in turn, were defined in subsection 2.4.2. as follows:

CON Rights. To the extent assignable or transferable, all of Seller's right, title and interest in and to any licenses and Certificate of Need Rights ("CON") (including state licenses and CON Rights for 121 beds of assisted living and memory care or adult care), permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held or controlled by Seller with respect to any of the Assets, including, without limitation, all such licenses, permits, consents, authorizations, approvals, registrations and certificates, if any, issued by any Governmental Authority necessary for the use, operation, or occupancy of the Real Property (or any portion thereof).

The APA further defines the "Real Property" as the Facility.  See APA, section 1.1 (defining "Real Property," "Fee Premises," and "Improvements;" and Exhibit A thereto).

14

neither appealed nor sought a stay of the AA Holdings Sale Order.

Prior to the rulings from the Western District Bankruptcy Court and the closing of the sale to AL Investors, Debtor appealed DHHS's decision not to renew Debtor's license. Ex. 3. AL Investors intervened in the appeal, and ultimately filed a joint motion with the Debtor for a temporary stay pending resolution of the AA Holdings Bankruptcy Case, which the Administrative Law Judge granted on October 12, 2017, prior to the entry of the AA Holdings Sale Order on November 9. Ex. 4. The Administrative Law Judge's order stayed the appeal through the resolution of the AA Holdings Bankruptcy Case, and required Debtor and AL Investors to submit a status report no later than January 15, 2018. Id. ¶¶ 1-2. At the January 23 hearing on this matter, Owens testified that she did not know the status of the appeal or the required status report to the Administrative Law Judge.

Seven days after the Western District Bankruptcy Court denied Debtor's Motion to Reconsider, on November 16, 2017, Debtor filed a voluntary, chapter 11 petition in this Court. Debtor has not complied with the deadlines established by the Bankruptcy Rules and this Court since the inception of the case. The day after Debtor filed its petition, the Court entered the Chapter 11 Operating Order. Chapter 11 Operating Order [Doc. 3]

15

("Operating Order").  The Operating Order explained, among other things, that Debtor's first Monthly Operating Report would be due within thirty days.  Id. at 3 ("The first Monthly Report is due within thirty (30) days after entry of the Order for Relief.").  Additionally, Under Fed. R. Bankr. Proc. 1007(c), a debtor must file their schedules within fourteen days of the filing of their petition.  Under this rule, Debtor's schedules were due in this case on November 30, 2017.  On December 1, 2017, a day after the deadline to file the schedules, Debtor moved for an extension, which the court denied based on an absence of excusable neglect as required by Rule 9006(b)(1).[13] Order Denying First Motion to Extend Deadline to File Schedules [Doc. 33].  Debtor still has not filed its first monthly report.

On December 22, 2017, the BA moved to dismiss or convert the case for cause under 11 U.S.C. § 1112(b)(1).  Under Local Rule 9013-1, Debtor's response was due "within the earlier of 14 days from the date of the service of the motion, or 3 business days from the date of the hearing on the motion[.]"  Debtor's response therefore was due on or before January 5, 2018.

---

[13] As explained at the hearing on December 14, 2017, this is the second time counsel for this Debtor has relied on an outdated set of rules in a related case, despite this Court pointing out the deficiency in its Rain Tree Healthcare Order Denying Stay Pending Appeal, p.2 n.1.

Debtor's Reply was not filed until January 22, 2018, the day before the scheduled hearing.[14]

### III. Discussion

The BA requests that the Court dismiss or convert Debtor's case for cause under sections 105[15] and 1112(b)(1).[16]  Under section 1112(b)(1), absent limited exceptions, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ," unless the court determines that appointment of a chapter 11 trustee is in the best interest of either creditors or the estate.  11 U.S.C. § 1112(b)(1) (citing section 1104(a)).  The movant bears the burden of proving cause by a preponderance of the evidence.

---

[14] The failure to timely file a response to the motion does not itself constitute "cause" under § 1112(b)(4)(F), but demonstrates a continuing failure by Debtor to be diligent in its obligations to the Court.

[15] Section 105(a) empowers

> [t]he court [to] issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[16] The BA has standing to seek dismissal under § 1112(b).  See Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 317(b) (1990) (granting bankruptcy administrators identical standing of that granted to the United States Trustee under 11 U.S.C. § 307); see also In re Curtis L. Stuart@UCC1-207, No. 05-95809-JB, 05-96715-JB, 2005 WL 3953894, *2-3 (Bankr. N.D. Ga. December 19, 2005) (language of section 307 "unquestionably" confers standing on the United States Trustee to move for dismissal under section 1112(b)); 7 COLLIER ON BANKRUPTCY ¶ 1112.04[1] (Richard Levin & Henry Sommer eds. 16th ed.) ("Collier") (same).  Similarly, section 307 of the Judicial Improvements Act of 1990 unquestionably confers standing on the Bankruptcy Administrator under section 1112(b)(1).

If the movant makes a <u>prima</u> <u>facie</u> showing, the burden then shifts to the respondent to establish with evidence unusual circumstances under 11 U.S.C. § 1112(b)(2) making dismissal or conversion adverse to the best interests of creditors or the estate. <u>In re MF Glob. Holdings Ltd.</u>, 465 B.R. 736, 742 (Bankr. S.D.N.Y. 2012). In the absence of unusual circumstances, the court has broad discretion in determining whether conversion or dismissal is in the best interests of creditors and the estate. <u>In re Creech</u>, 538 B.R. 245, 248 (Bankr. E.D.N.C. 2015). To meet its burden of proof, the BA requested that the Court take judicial notice of the record in this case, which request the Court granted, along with taking judicial notice of the record in the AA Holdings Bankruptcy Case and the AA Holdings Appeal.

**A. Cause for Dismissal or Conversion**

While the Code does not explicitly define "cause" for purposes of § 1112(b)(1), § 1112(b)(4) provides a non-exhaustive "list of enumerated examples of facts that would constitute cause." <u>In re Landmark</u>, 448 B.R. 707, 711 (Bankr. D. Md. 2011). As explained by the First Circuit:

> Although the language of section 1112(b) provides a list of possible circumstances for "cause," this is not an exhaustive list, and in fact "the court is not limited to the enumerated grounds in making its determination of some 'cause.'" Thus, in determining "cause" for dismissal the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases. The court, however, must exercise its sound judgment in reaching

18

> a determination and must ascertain that the decision
> is in the best interest of creditors.

In re Gonic Realty Trust, 909 F.2d 624, 626-27 (1st Cir. 1990) (citations omitted).[17]  In addition to this discretion, a single "cause" is sufficient to warrant a chapter 11 dismissal for cause.  In re Creekside Sr. Apartments, L.P., 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013) (citing Reagan v. Wetzel (In re Reagan), 403 B.R. 614, 621 (8th Cir. BAP 2009)); see also Hoover v. Harrington (In re Hoover), 828 F.3d 5, 9 (1st Cir. 2016) (where bankruptcy court found three bases for cause, appellate court only reached the first because "one cause is enough").

In this case, the BA asserts that cause exists under section 1112(b)(4)(A) due to a substantial continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation, and under section 1112(b)(4)(F) due to

---

[17] Congress substantially revised section 1112(b) in 2005.  See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, § 442 92005 (2005).  Former section 1112(b) provided that the court "may" dismiss or convert a case for cause.  Under the prior standard, courts were permitted to exercise broad discretion to determine whether any demonstrated cause was sufficient to dismiss or convert.  See, e.g., In re Lumber Exchange Bldg. Ltd. Partnership, 968 F2d 647, 648 (8th Cir. 1992) (citing Gonic Realty Trust, 909 F.2d at 626-27)).  The revisions altered this rubric.  See Collier, ¶ 1112.04[4] ("the statute does not appear to provide unfettered discretion in determining whether cause exists . . . [i]f one of the enumerated examples of cause set forth in section 1112(b)(4) is proven by the movant by a preponderance of the evidence").  The revisions separated former section 1112(b) into four subsections, and provided that, where one of the enumerated bases for cause is established by a preponderance of the evidence, the court "shall" convert or dismiss a case, whichever is in the best interests of the creditors and the estate, unless the court appoints a chapter 11 trustee or the exception in newly created section 1112(b)(2) applies.  Debtor did not argue that the exception under section 1112(b)(2) applies or establish any unusual circumstances that would prohibit dismissal. In any event, the statute makes clear that the exception under section 1112(b)(2) does not apply where cause is established under section 1112(b)(4)(A), as it has been here.  See 11 U.S.C. § 1112(b)(2)(B).

Debtor's untimely filing of schedules and monthly report.  The BA further contends that cause exists because the filing of the case was for an improper purpose.  For the reasons set forth below, and mindful of the purposes of chapter 11 relief, the Court finds cause to dismiss this case on each of these bases.

### 1.   Substantial or Continuing Loss or Diminution of the Estate and Absence of Likelihood of Rehabilitation

The BA first contends that there is cause to dismiss this case under section 1112(b)(4)(A) in that Debtor has no operations or income with which to fund the administrative expenses of the estate and there is no likelihood of a rehabilitation.  In order to establish cause under this section, the movant must establish both: (1) a substantial or continuing loss to the estate postpetition;[18] and (2) the absence of a reasonable likelihood of rehabilitation.  See In re Paterno, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).

---

[18] The enumerated bases for cause under section 1112(b)(4) each focus on the postpetition circumstances of a debtor and its postpetition progress toward reorganization "even though the debtor's intentions at the time of the filing may be strictly honorable."  See Collier ¶ 1112.07[1].  "In contrast to testing the debtor's prospects of reorganization, the [subjective] good faith standard [discussed below] focuses directly on the subjective intentions of the debtor and proper use of the bankruptcy system as a general system of equity and is designed to prevent 'abuse of the bankruptcy process, or the rights of others, involv[ing] conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community.'"  Id. (quoting In re Victory Constr. Co., Inc., 9 B.R. 549, 559 (Bankr. C.D. Cal. 1981)).

### a. Substantial or Continuing Loss or Diminution of the Estate

As recognized by the Eighth Circuit, "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow—including that resulting only from administrative expenses— . . . is enough to satisfy the first element of § [1112(b)(4)(A)]." Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (3d Cir. 2004). In this case, Debtor never has had any business operations. The only asset Debtor asserts—its license associated with the operation of the 121 Authorized Beds located at the Facility—is not viable and the overwhelming evidence before the Court indicates that it has no value. Renewal of the license was denied, and Debtor did not provide any evidence tending to show that a putative expired license to operate a 121 bed adult care facility of which Debtor never took possession, and for which license DHHS denied renewal due to Debtor's failure to bring that facility into compliance with state law, has any separate value whatsoever—especially after the Facility and all the related CON Rights for the 121 Authorized Beds have been sold free and clear of any interest of Debtor pursuant to an unappealed and final order of a United States Bankruptcy Court.[19]

---

[19] Even if there had been an appeal, Debtor did not seek a stay of the AA Holdings Sale Order and the sale has closed. Therefore, AL Investors would be protected by 11 U.S.C. § 363(m), which would insulate any transfer even in the event of a reversal.

In fact, the evidence demonstrates that any value in the license resided in the CON Rights associated with the 121 Authorized Beds for which AL Investors actually and ultimately paid $2,300,000.00 in the AA Holdings Bankruptcy Case, rather than the putative, expired license by this non-operating Debtor. Under these circumstances, the continued costs of administering the estate, including counsel fees and quarterly fees, constitutes a sufficient continuing loss to the estate to support a finding of cause under section 1112(b)(4)(A).

**b.    Absence of Reasonable Likelihood of Rehabilitation**

The record in this case is abundantly clear that there is no likelihood of rehabilitation of a business as contemplated by section 1112(b)(4)(A), a point which Debtor implicitly concedes when it argues that the only purpose of this case is to provide a forum in which it can sell the putative license. Even if: (1) a sale of the license were viable; (2) the sale of a single asset that is related to a business that has never operated and never will operate were a legitimate purpose for chapter 11 relief; and (3) Debtor could confirm a liquidating plan to sell the license primarily for the benefit of its principal, such a liquidation does not constitute rehabilitation as contemplated by section 1112(b)(4)(A). Collier well explains this requirement as follows:

> Significantly, the second part of the test under section 1112(b)(4)(A) requires a reasonable likelihood of "rehabilitation," not "reorganization." Thus, the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort. Rehabilitation is not another word for reorganization. Rehabilitation means to reestablish a business. Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation.

Collier ¶ 1112.04[6][a][ii] (footnotes omitted); see also Paterno, 511 B.R. at 68 ("Rehabilitation is a more demanding standard than reorganization, and is defined by whether the debtor will be able to reestablish his business on a firm, sound basis[;]" and "Where a debtor proposes a plan of pure liquidation, there is no likelihood of rehabilitation."). Therefore, Debtor's proposed liquidation of the license, even if it were viable, does not establish likelihood of rehabilitation of a business that never operated in the first place, and the BA has established "cause" under § 1112(b)(4)(A).

### 2. Failure to Comply with Court Order and Unexcused Failure to Timely File Schedules

The record in this case also establishes cause under section 1112(b)(4)(F). This section provides that cause includes an "unexcused failure to satisfy timely any filing or reporting requirements established by this title or by any rule applicable to a case under this chapter." 11 U.S.C. 1112(b)(4)(F). The BA contends that cause exists under this

23

subsection due to Debtor's failure to file its monthly report and failure to timely file its schedules.[20] Debtor has failed to file even the first of its monthly operating reports. Counsel was notified of the missing first monthly operating report by the BA at the evidentiary hearing on the Motion to Dismiss or Convert, January 23, 2018. As of the filing of this Memorandum Opinion and contemporaneous Order, Debtor still has not filed a monthly operating report. Debtor's continuing failure to comply with the Operating Order is especially troubling given that Debtor is not operating, which should make a monthly operating report relatively simple to complete and file.

Debtor also failed to file its schedules on time, a failure ultimately deemed unexcused due to counsel's reliance on an outdated set of the Federal Rules of Bankruptcy Procedure. Further, despite counsel's previous, unexcused delay, counsel's response to the Motion to Dismiss or Convert also was late. When considering all these failures together, along with the

---

[20] Section 1112(e) similarly provides that, on the motion of the United States Trustee, the Court may dismiss or convert a case if the debtor fails to timely file the information required by 11 U.S.C. § 521(a)(1). Although there is some overlap in the documentation required by § 521(a)(1) and Bankruptcy Rule 1007(b), they are not identical. Regardless, Debtor failed to timely comply with either section in this case without cause or an extension of the time by the Court. Debtor did not even request an extension of the time under section 1112(e), and the Court would not have granted such an extension in any event. As stated above, Debtor's schedules list amounts owed to no more than three creditors including Owens, and only one creditor, the Internal Revenue Service, has filed a proof of claim. Debtor has no operations and only a single claimed asset. There was no cause for Debtor to need additional time to comply with the requirements of the Code or the Rules, and Debtor did not even attempt to articulate any factual basis for such.

circumstances and basis for the filing of this case, Debtor's behavior indicates a flouting of the requirements of the Bankruptcy Code, applicable rules, and this Court's orders and a lack of postpetition good faith and diligence in seeking relief from this Court that rises to the level of "cause" to dismiss or convert the case as contemplated by section 1112(b)(4)(F).[21]

"To reap the benefit of chapter 11, the debtor must pay the price of disclosure; [the debtor] needs to provide financial and other relevant information to the creditors to inform them and the Court about the progress and status of the case." In re Tornheim, 181 B.R. 161, 164 (Bankr. S.D.N.Y. 1995). While Debtor's failure to timely file its schedules or to file a monthly operating report may not prejudice the paucity of non-insider potential creditors in this instance due to the lack of any operations or assets, as provided in more detail below, Debtor's dilatory efforts indicate that these failures constitute sufficient cause to dismiss or convert this case. Cf. In re Chesmid Park Corp., 45 B.R. 153, 159 (Bankr. E.D. Va. 1984) ("The dilatory lack of filing of a disclosure statement is evidence that this debtor is not serious in its intention to reorganize.").

---

[21] Unlike the revised language of section 1112(b)(1), section 1112(e) still uses the term "may," and, therefore, grants the court broad discretion in taking any action at all even where the debtor has failed to comply with the statutory time limit. Nevertheless, under the circumstances of this case, the Court similarly finds that it is appropriate to dismiss this case under section 1112(e) for the reasons set forth herein.

### 3.   Objective Futility & Subjective Bad Faith

The BA also asserts that there is cause under section 1112(b)(1) because Debtor filed this case for an improper purpose.  It is well settled in this circuit that "a generalized 'good faith filing' requirement appears implicit in § 1112(b)."  Carolin Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1989).[22]  To dismiss a case for cause due to an absence of good faith in filing, a court must find "*both* objective futility and subjective bad faith . . . ."  Carolin, 886 F.2d at 700-01 (emphasis in original); see also In re SUD Properties, Inc., 462 B.R. 547, 551 (Bankr. E.D.N.C. 2011) ("The Fourth Circuit utilizes a two-prong test for determining whether a Chapter 11 petition should be dismissed for lack of good faith.").  While "separate inquiries into each are required, proof inevitably will overlap."  Carolin, 886 F.2d at 701.

In assessing objective futility, the court should "concentrate on assessing whether 'there is no going concern to preserve . . . and . . . no hope of rehabilitation, except

---

[22] Stating further:

> It is of course obvious that "if there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its <u>raison</u> d'etre . . . ."  [<u>In re Winshall Settlor's Trust</u>, 758 F.2d 1136, 1137 (6th Cir.1985)] (quoting <u>In re Ironsides</u>, 34 B.R. 337, 339 (Bankr. W.D. Ky. 1983)), and the ability of bankruptcy courts to inquire into that critical matter at the very threshold would seem indispensable to proper accomplishment of the basic purposes of Chapter 11 protection.

<u>Id.</u> at 698.

according to the debtor's 'terminal euphoria.''"   Id. at 701-02
(quoting In re Little Creed Development Co., 779 F.2d 1068, 1073
(5th Cir. 1986)).   The overarching consideration for subjective
bad faith is closely related.   "The subjective bad faith inquiry
is designed to insure that the petitioner actually intends 'to
use the provisions of Chapter 11 . . . to reorganize or
rehabilitate an existing enterprise, or to preserve going
concern values of a viable or existing business.'"   Id. at 702.
With these standards in mind, the court in Carolin upheld the
bankruptcy court's dismissal of a chapter 11 case where "the
evidence suggested that there was not actually an ongoing
business to protect, and that [the debtor] was more akin to a
shell corporation than a viable enterprise."   Id. at 703.

　　　The circumstances of this case are the epitome of an
improper chapter 11 filing.   There never has been any operating
business to protect and even Debtor does not contend that there
is any prospect of one.   Moreover, even if the sale of a single,
non-operating asset could be a proper basis for chapter 11
relief under certain circumstances, there is no realistic
expectation of such a sale in this case.   The single putative
asset here is an expired license to operate a Facility that has
been sold free of any interest of the Debtor.   The CON Rights
associated with the Facility similarly have been transferred and
assigned.   DHHS denied Debtor's license renewal application for

failure to bring the (now sold) Facility into accordance with state requirements. Debtor's lease of the real property, to which the license attached, was terminated. At the hearing, Debtor's managing member testified to the interest of an additional buyer, but provided no evidence to suggest a sale was more than another instance of this debtor's "terminal euphoria."[23] In <u>Carolin</u>, the case properly was dismissed even where the debtor had a "tenuous" letter of intent for rental of its property. <u>Id.</u> at 702.[24] Here, there is no documentary evidence of any potential buyer other than the former contract with AL Investors[25] and Debtor has no source of income.[26] For

---

[23] Considering the totality of the record before it and the veracity of the witness, the Court concludes that Debtor's intent goes beyond "terminal euphoria," and constitutes an improper attempt to use this Court and the bankruptcy process as a litigation tactic in lieu of an appeal of the AA Holdings Sale Order. This alone demonstrates that the case was filed for an improper purpose and with subjective bad faith. <u>Cf.</u> <u>In re Van Eck</u>, 425 B.R. 54, 63 (Bankr. D. Conn. 2010) ("Using a chapter 11 case as a platform to attack final orders of other courts" is an improper purpose for seeking chapter 11 relief, and constitutes an unenumerated additional cause for dismissal under 11 U.S.C. § 1112(b)(1)). This is the second time in this Court that Owens has attempted to improperly use the process in this way. <u>See</u> Rain Tree Healthcare Order Denying Stay Pending Appeal, pp. 18-19.

[24] In <u>Carolin</u>, if the debtor's "tenuous" plans came together, there would have been the potential for a viable business. Even if Debtor's wildest dreams came true in this case, there is no potentially salvageable business—only the sale of an asset.

[25] Debtor offered the former contract with AL Investors as evidence that the license could be sold. AL Investors has purchased the CON Rights and the Facility in the AA Holdings Bankruptcy Case. Debtor's contention that the contract with AL Investors is salvageable is beyond "tenuous."

[26] Owens testified that she would finance the administrative expenses of the estate, but offered no evidence to demonstrate the viability of this promise and the Court finds her testimony lacked credibility. Regardless of any ability to finance the expenses of the estate, her proposed use of chapter 11 to litigate over the viability of a non-operating putative asset does not constitute a proper utilization of the Bankruptcy Code or this Court, and

these reasons, there is not even the "remotely speculative chance of successful Chapter 11 reorganization" that was present in Carolin, id. at 703, and the Court finds that this case is objectively futile.

Based on the totality of the circumstances, the Court also finds that Debtor filed this case with subjective bad faith.[27] In recommending against "forcing particular facts into previously identified patterns[,]" the Fourth Circuit Court of Appeals noted "that a totality of circumstances inquiry is required; that 'any conceivable list of factors is not exhaustive'; and that there is no 'single factor that will necessarily lead to a finding of bad faith.'" Id. at 701 (quoting In re Natural Land Corp., 825 F.2d 296, 298 (11th Cir. 1987)). Any consideration of factors must focus on whether, in filing the case, debtor intended to use the provisions of chapter 11 to reorganize or rehabilitate an existing enterprise. Id. at 702.

---

Debtor offered no cogent reason for the necessity of the automatic stay or why any litigation could not be conducted in the state courts. Owens obliquely testified that the state courts would not grant her relief due to the prior rulings of the Western District Bankruptcy Court and that a trustee appointed under a chapter 7 case likely would determine that the license had no value. Although the Court fully agrees with Debtor that it likely would not be entitled to relief in the state courts and that a chapter 7 trustee would find that there is no value in the putative license, these reasons do not give rise to a proper purpose for chapter 11. If anything, they further support findings of objective futility and subjective bad faith.

[27] See footnote 23, supra.

No nuanced consideration of factors is needed in this case. Debtor concedes that it filed this case solely to sell the putative license of a non-operating entity, and to provide a forum in which it potentially could gain a litigation advantage that it could not achieve by appeal in the Western District, in state court, or with DHHS.  At the first hearing in this case, counsel was unable to describe satisfactory reasons for filing this case in chapter 11 as opposed to chapter 7.[28]  At the later

---

[28] At the initial status hearing in this case on December 14, 2017, the Court and counsel had the following exchange:

> Court:     Mr. Lewis, why does this need to stay in an 11, rather than in . . . even if you're right about the property, even if you're right about the license, even if Judge Beyer gets reversed, why isn't this a 7 case where the chapter 7 trustee could sell the license?  What needs to operate in an 11?  Why would you want the quarterly fees?  Why do . . . . ?  Why?

> Counsel:   Well, that's something we thought about, and we know, looking at maybe . . . [inaudible] . . . a sale through chapter 7 and 363 and a sale through chapter 11 license, we looked at that and you know, maybe, you know . . . we just felt like chapter 11 would be the best place to file it and based on what we could do in a chapter 11 versus a chapter 7 and all, so a chapter 7 trustee . . . .

> Court:     What is it that you can do in an 11 that you can't do in a 7 in this case?  Under the facts of this case?

> Counsel:   In a chapter 11, first and foremost the debtor is the debtor in possession in control . . . the . . . can control the decisions in a case.  In a chapter 7, the trustee gets to make the decisions on what they want to pursue and not pursue.

> Court:     But under 1112, if there's cause, I don't consider the debtor's desires.  I only consider the desires and interests of the creditors and the estate.

> Counsel:   I explained that to my client, Your Honor.  So, if there is cause and you convert it, my client understands.  But, that's what she wanted to file.  Chapter 11.  So, I gave her the different options, and that's what she wanted [inaudible].

hearing on the BA's Motion to Dismiss or Convert, the Court again pressed counsel to articulate a proper purpose for chapter 11 relief.[29]   In response, counsel continued to be unable to

---

Doc. 26, 25:10-26:50.  Counsel also stated that he had not read the docket in the AA Holdings Bankruptcy Case and did not know whether Debtor appealed the AA Holdings Sale Order.  Id. at 15:20-16:15.

[29] At the hearing on the Motion to Dismiss, the Court and counsel had the following exchange:

Court:      I asked you at the last hearing, what was the purpose . . . why did it need to stay in an 11?  . . . why'd you file this as an 11 versus a 7.  Why is the necessity of an 11 to sell an asset in a non-operating entity?  And you didn't have an answer for me for that.  You said that you didn't know that there was a purpose—that . . . that it benefit more in an 11 than in a 7, or less in a 7 than it does in an 11. And, of course, you made the decision to file before I asked you that question, so it's not as though that's an unfair question.  That's a, that's a question counsel should be considering when counsel advises clients where they should file and when counsel signs petitions with this Court about whether there's a good faith reason for being in a particular chapter.  So, why is it?  There's no operation here.  Certainly, you can have a liquidating 11, as Mr. Price says, when it benefits from the process of an 11.   Usually, an operating entity that you want going concern value for and the best way to liquidate it is through that.  Here, there's no operating entity.  There's a license in dispute at best.  And, that seems to me that there's absolutely no purpose for a chapter 11 here versus a chapter 7.  Why have things changed since I asked you that at the last hearing?

Counsel:     Yeah.  [inaudible] That was a very good question and I thought about it, Your Honor, and I talked to my . . .

Court:      Shouldn't you have thought about it before you filed the petition?

Counsel:     I . . . I . . . did, Your Honor, but my client wasn't there and I didn't want to . . . I wanted to discuss with my client before I responded.  That's why I said I wasn't sure. . . . We know that we filed the chapter 11 because we wanted to . . . liquidate the asset—the only asset that the debtor had.  There were questions about whether the license . . . whether the license had . . . divested through a sale.  There were questions about whether the license had been rejected through a rejection of the lease . . . we wanted to make sure that we stayed all litigation out there so that we could determine whether this asset . . . is an asset that can be liquidated—that we have.

Court:      And the difference . . . and the difference between an 11
            and a 7 on everything you have just said is nothing.

Counsel:    Well, I haven't finished what I was saying, Your Honor, so,
            . . . if you'll allow me, if we file a chapter 7 . . . the
            cost of litigation would be too much . . . we . . . we
            determined that the cost of litigation probably would be
            too much for a chapter 7 trustee to take on.  However, we
            have a principal, a managing member shareholder, who has
            agreed to take on the cost of this bankruptcy.  She's gonna
            pay the quarterly fees, she's gonna pay the litigation . .
            . she's going to pay . . . the cost of court, the
            litigation, everything related to this—something that a
            chapter 7 probably would not take on.  Plus, there is an
            issue of an order in the Western District of North
            Carolina, which some may say is <u>res</u> <u>judicata</u>, and
            collaterally estopped, and some may say it's not.  A
            chapter 7 trustee weighing those options probably would
            call this case a no asset case and let it go.  There is
            another issue about the license.  The license is supposed
            to be . . . we claim the license is valid.  We claim that
            the State did not renew the license, but like all . . .
            state agency decisions, you have the right to appeal, and
            the debtor did appeal.  That appeal is pending, and it has
            been stayed.  It was stayed prior to the bankruptcy, but it
            has been stayed, and we're going to put on evidence to show
            that, Your Honor.  So there are a lot of moving pieces
            going on.

Court:      I'm sorry.  What has been stayed?

Counsel:    [T]he . . . there were . . . the appeal of the failure to
            renew the license by the state agency has been appealed.

Court:      But not the appeal of Judge Beyer's order.  That has not
            been stayed, correct?

Counsel:    No.  I have not addressed that order yet, Your Honor.  I am
            addressing the Bankruptcy Administrator's statement that he
            thinks the case should be dismissed because there is no
            license.  We argue that there is a license, and that . . .
            that . . . that, the appeal of the license just keeps the
            license in place.  You can still operate while the license
            is being appealed, and we believe that . . . that actual .
            . . that contested matter in the state agency has been
            stayed.  It was stayed prior to the filing of the
            bankruptcy, but we believe that with all these moving
            pieces, that a chapter 11 liquidation is better sought and
            better brought on by the actual debtor and its . . .
            shareholders because a chapter 7 trustee would look at this
            case and not pursue it.  Just like the Bankruptcy
            Administrator looks at this case and says that it better be
            dismissed.  We believe that there is life in the case.  We
            believe that there is an asset—a valuable asset.  And
            that's why we filed the chapter 11, Your Honor.  So, I hope
            that answers your question.

articulate a sound reason other than the interest of the Debtor in selling the license and refusing to cede control to a chapter 7 trustee. None of the bases cited by Owens or counsel constitute a valid basis for chapter 11 relief, and the record

---

Doc. 30, 11:58-16:42. This exchange, the exchange at the status hearing, and other comments of counsel on the record at the status conference (including, but not limited to, his failure to review the docket in the AA Holdings Bankruptcy Case prior to filing the petition in this case) collectively illustrate a number of things. First, counsel did not sufficiently fulfill his duties in determining the applicable facts and law before he signed the petition in this case and filed it with the Court. See Fed. R. Bankr. P. 9011(b) ("By presenting to the court . . . a petition . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, <u>formed after an inquiry reasonable under the circumstances</u>,— . . . it is not being presented for an improper purpose . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . [and] the allegations and other factual contentions have evidentiary support" (emphasis added)). Second, for the reasons stated herein, and as explained by the Court at both hearings, counsel filed this chapter 11 case for an improper purpose under the Code, again in violation of his duties under both Rule 9011(b) and potentially 28 U.S.C. § 1927 (authorizing sanctions against counsel who unreasonably and vexatiously multiplies proceedings). Third, counsel has conceded his intent was to file a case for a purpose that is patently improper as demonstrated by <u>Carolin</u> and its progeny and explained herein. As set forth above, this is at least the second case this year that counsel has filed with this Court that has been dismissed, and in which the Court has held that the filing was in bad faith. This is not the first time counsel has breached his duties. Counsel previously and repeatedly has been disciplined by the United States Bankruptcy Court for the Eastern District of North Carolina for violations of the North Carolina Rules of Professional Conduct and Bankruptcy Rule 9011. <u>See In re Anderson & Parchment</u>, Case No. 16-00498-5-JNC (Bankr. E.D.N.C. January 6, 2017) (extending counsel's suspension from practice in the Eastern District Bankruptcy Court through March 6, 2017); <u>In re Moshaashaee</u>, Case No. 15-02941-DMW, 2015 WL 4689019 (Bankr. E.D.N.C. June 7, 2016), Doc. 241; <u>In re Barnhardt</u>, Case No. 12-08308-8-JRL, (Bankr. E.D.N.C. Jan. 14, 2013), Doc. 18 and Doc. 23 (Bankr. E.D.N.C. Feb. 12, 2013); and <u>In re Williams</u>, Case No. 12-05122-8-SWH (Bankr. E.D.N.C. Aug. 16, 2013), Doc. 262. Further filings in this Court that are in violation of the Rules of Professional Conduct, Bankruptcy Rules, and counsel's obligations to this Court will not be tolerated. As observed by Judge Humrickhouse in <u>Williams</u>, "[t]he ability to practice law is a privilege, not a right." <u>Williams</u>, Case No. 12-05122-8-SWH, p. 13. It is an entirely insufficient explanation that counsel merely explained to Owens her options and then facilitated her choosing an option that is patently improper. Counsel may not take refuge in client instructions when presenting matters to the Court that violate his duties. <u>See e.g.</u>, <u>In re Martinez</u>, 393 B.R. 27, 36 (Bankr. D. Nev. 2008) ("attempted refuge to client instructions is unavailing").

amply demonstrates that each of them is patently aware that there is no business to reorganize or rehabilitate in this case.

Debtor's professed perception of the relative vigor with which a chapter 7 trustee approaches each case does not create a proper purpose for chapter 11. Chapter 11 is for those debtors who intend to "'to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business.'" Carolin, 886 F.2d at 702 (quoting Victory Constr., 9 B.R. at 550). In this case, Debtor's "real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize [her] financial activities.'" Carolin, 886 F.2d at 702 (quoting In re Thirtieth Place, Inc., 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)).

The status of the administrative proceedings, Debtor's lack of diligence in this case, and its lack of diligence in the courts in the Western District of North Carolina, including its failure to appeal the AA Holdings Sale Order provide further evidence of Debtor's subjective bad faith. DHHS made its decision not to renew the license and the state administrative law judge ("ALJ") granted a stay of the appeal prior to the resolution of the matter in the Western District Bankruptcy Court. Now that the AA Holdings Sale Motion has been resolved,

34

it is likely that the stay granted by the ALJ no longer is in effect according to its terms, yet the Debtor had no information about the status of the appeal at the hearing in this matter, which was over a week after the scheduled status conference before the state ALJ.   Debtor has not filed a single monthly operating report even after the BA moved to dismiss based in part on that failure, has not sought any extension of its obligation to file the monthly reports, did not file its schedules on time, and did not file a timely response to the BA's Motion to Convert or Dismiss.

Additionally, Debtor's filing of this bankruptcy a mere seven days after the Western District Bankruptcy Court denied its motion to reconsider—without moving to stay either the AA Holdings Order Rejecting Lease or the AA Holdings Sale Order or to appeal the Sale Order—further attests to Debtor's use of this Court and the chapter 11 process merely for the purpose of additional delay and litigation tactics.   Both the Western District Bankruptcy Court and the United States District Court found that this Debtor engaged in dilatory practices in those respective proceedings.   These findings, in combination with the evidence set forth in the record, sufficiently indicate subjective bad faith in the filing of Debtor's chapter 11 petition.

**B. Dismissal or Conversion**

Having determined that cause exists, the Court must decide whether dismissal, conversion, or the appointment of a trustee is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1); In re NOA, LLC, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) (quoting In re Sydnor, 431 B.R. 584, 600 (Bankr. D. Md. 2010)). The court has broad discretion in choosing between the alternatives of conversion or dismissal. In re Helmers, 361 B.R. 190, 196 (Bankr. D. Kan. 2007). "In deciding whether dismissal or conversion is warranted, the court is mindful of the twin goals of a chapter 11 reorganization: preserving viable businesses and maximizing creditors' returns." Creech, 538 B.R. at 248. The court further should consider the expressed preference of the creditors since "'parties will be the best judge of their own interests[.]'" Lakefront Inv'rs LLC v. Clarkson, 484 B.R. 72, 82 (D. Md. 2012), aff'd sub nom. Lakefront Inv'rs, LLC v. Sydnor, 520 F. App'x 221 (4th Cir. 2013) (quoting Collier § 1112.04[7]).

In this case, there are few, if any non-insider creditors, and no creditor appeared in this case to express a preference between dismissal or conversion. The BA urges dismissal. In exercising its discretion, a court should consider several factors including:

(1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of the creditors; (5) in assessing the interests of the estate, whether conversion or dismissal would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset;" (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan had been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

Id. at 83 (citing Collier § 1112.04[7] (citing cases)); see also Andover Covered Bridge, LLC, 553 B.R. 162, 177 (B.A.P. 1st Cir. 2016).  In its analysis, a court reviews each remedy and its "impact on the creditors and on the estate . . . ."  In re Superior Siding & Window, Inc., 14 F.3d 240, 243 (4th Cir. 1994).  Dismissal is appropriate where a "Chapter 7 liquidation would likely produce little to no benefit to creditors and the estate."  In re Washington, No. C/A 09-08248-DD, 2010 WL 5128955, at *4 (Bankr. D.S.C. Sept. 27, 2010).

Here, (1) Debtor has never operated, and there is no indication of any potentially recoverable transfers that could benefit creditors; (2) dismissal would not result in any loss of rights because the only asset at issue, the expired license, has

37

no value, and even if it does, Debtor may pursue its rights in state court or with DHHS;[30] (3) further filings upon dismissal are unlikely unless such filings are also in bad faith, which is not a reason to retain jurisdiction in a chapter 7 case; (4) it's unlikely a chapter 7 trustee would be able to sell the putative license;[31] (5) Debtor may pursue securing value for the license outside of bankruptcy court; (6) both the state court and DHHS are fully equipped to determine the viability of any putative license, the determination of which requires no expertise of the bankruptcy court; (7) the estate consists of a single, putative asset which likely has no value; (8) there are limited non-insider creditors whose interests do not require protection because the single, putative asset has no value; (9) no property of value remains in the estate and no plan has been confirmed; and (10) there are no environmental or safety concerns apparent from the record because Debtor has no operations and no residents to protect. For these reasons, the case will be dismissed.

---

[30] The fact that Debtor thinks such an effort would not be fruitful is not because the other fora are ineffective, but because Debtor concedes that it likely would obtain adverse rulings, a concession which further demonstrates subjective bad faith.

[31] Debtor in fact concedes that a chapter 7 trustee likely would abandon Debtor's only putative asset.

## IV.  Conclusion

For the reasons set forth above, the Court will enter an order contemporaneously with this Memorandum Opinion granting the Motion to Dismiss and requiring Debtor's counsel to carefully review footnotes 28 and 29 in this Memorandum Opinion.

[End of Document]

## **Parties To Be Served**

RainTree Healthcare of Forsyth LLC
P.O. Box 668611
Charlotte, NC 28266

Robert Lewis, Jr.
The Lewis Law Firm, P.A.
555 Fayetteville Street, Suite 201
Raleigh, NC 27601

William P. Miller
Bankruptcy Administrator
101 South Edgeworth Street
Greensboro, NC 27401